GUIDRY, Judge.
Charlene Beauclair instituted this action for damages for personal injuries sustained by her as the result of a fall from a 1980 GMC Suburban. Made defendants in the suit were Leroy G. Caubarreaux, driver of the suburban, the State of Louisiana, Through the Department of Wildlife and Fisheries (State), owner of the suburban, and The Travelers Insurance Company (Travelers), insurer of the suburban. Plaintiff alternatively sought worker’s compensation benefits from the State. The State denied that such benefits were due to plaintiff since she had never been employed by it and sought dismissal of this claim on motion for summary judgment. The State’s motion for summary judgment was subsequently granted dismissing plaintiff’s demand for worker’s compensation benefits.[1] No appeal was taken from this latter judgment and same is now final.
Defendants’ answer to the petition asserted that plaintiff’s own negligence was the sole proximate cause of her injuries and/or that she had assumed the risk. Defendants also filed a third party demand against General Motors Corporation, manufacturer of the suburban, claiming that the *797 right front door on the suburban was defective.
Following a jury trial on the merits, judgment was rendered in favor of plaintiff and against Travelers, the State and Leroy Caubarreaux in the sum of $1,260,000.00.[2] The jury found the defendants to be 60% negligent, with the remaining 40% negligence assessed against plaintiff. Defendants’ third party demand against General Motors Corporation was dismissed.
Travelers, the State, and Caubarreaux suspensively appealed from the judgment against them. The issues presented on appeal are:
1. Whether the jury manifestly erred in finding Leroy Caubarreaux negligent and that such negligence was a proximate cause of plaintiff’s injuries;
2. Whether the jury manifestly erred in finding that the door of the GMC surur-ban was not defective, i.e., unreasonably dangerous in normal use; and,
3. Whether the award of damages is excessive.
Plaintiff answered the appeal alleging error in the jury’s finding that she was 40% negligent.
FACTS
The basic facts in this case are without serious dispute. The accident occurred on July 20, 1982. At the time of accident, Charlene Beauclair was 31 years old, separated from her husband, and living near Marksville, Louisiana, with two of her three minor daughters. She was enrolled in an accounting curriculum at a Vo-Tech school in Alexandria, with only a few weeks remaining prior to graduation. Charlene participated in many outside activities such as coaching a softball team and volunteering her services to various civic organizations. She also occasionally volunteered her services to the Department of Wildlife and Fisheries, although she never received any compensation from the State. Her volunteer work with the State included doing clerical work for Leroy Cau-barreaux as well as loading and unloading materials from his suburban and helping him set up for various wildlife programs. On the day of the accident, Charlene had volunteered to accompany Leroy Caubar-reaux to Lafayette where he had scheduled visits to the Lafayette Tourist Commission office, the University of Southwestern Louisiana Visual Aids Center, Beaver Park in Lafayette, the St. Martinville State Park and the Lafayette Bass Club. Leroy’s position with the State was as Wildlife Management Educator. His position required him to conduct educational programs for various civic and recreational organizations. Leroy was issued a new 1980 GMC suburban in October of 1980 which he kept at his home when not being used for work.
On the day of the accident, Leroy picked Charlene up in a parking lot in Bunkie at around 10:00 a.m. Charlene opened the right front door and got into the suburban with Leroy, closing the door behind her. She had two accounting books and a purse with her. On the seat between Leroy and Charlene was a small ice chest, some packets of teaching materials and other small pamphlets. The two proceeded to Lafayette and St. Martinville where they made several stops. Charlene opened and closed her own door on each occasion that she left the suburban. At around 4:00 p.m., Leroy brought Charlene to his office in Opelousas where they previewed a film which Leroy was going to show to the Bass Club that evening in Lafayette. Charlene decided not to go with Leroy to that program because she had an exam the following day. She stayed at the Opelousas office and studied.
*798 Shortly after 9:00 p.m. Leroy returned from the Bass Club program. When Leroy arrived, Charlene walked out to the suburban with her books and purse in hand. Leroy went into the office and then returned to find Charlene standing next to the suburban, waiting for him to unlock the door. Leroy unlocked her door, opened it and helped her into the suburban. He then closed the door behind her and went around to the driver’s side. Charlene was seated on the front seat with her books and purse on her lap. She testified that she held her books because there was no place to put them on the seat next to her. Leroy testified that Charlene was seated at an oblique angle rather than straight, with her back leaning more against the right passenger door than the back of the seat.
Leroy backed up the suburban and then headed out of the office parking lot. He made a right turn out of the lot onto Highway 182, heading north towards Opelousas. He drove through Opelousas, making a left turn near the Catholic church and then a right turn at the next block. He drove to a traffic light, slowing down for the traffic ahead of him. Leroy then proceeded along Highway 167 at a speed of around 30-35 mph, heading out of Opelousas. He had travelled approximately five miles from the district office. At this point, Highway 167 curved to the right and then to the left. As he drove out of the curve and was traveling down a straightaway, Leroy gradually started braking due to slower traffic ahead of him. As he did so, he heard a “swishing” sound. He turned and saw Charlene falling backwards out of the suburban. He stopped the vehicle and waited a few seconds, hoping that Charlene was uninjured and would return to the suburban. He thereafter pulled over to the side of the road and hurried to Charlene’s side to determine the extent of her injuries. The occupants of a following vehicle were already at her side. Charlene was bleeding from the back of her head.
Charlene was taken by ambulance to Doctor's Hospital in Opelousas where she was diagnosed as having a sutural skull fracture involving the sagittal and frontal sutures. She was thereafter transferred to Our Lady of Lourdes Hospital in Lafayette where she remained for four days under the care of Dr. Thomas V. Bertuceini. The hospital records from Our Lady of Lourdes indicate that Charlene was very lethargic and irritable upon her arrival there. She complained of severe headaches and had no recall of the events surrounding the accident. The x-rays taken revealed evidence of temporal and occipital fractures.
Charlene returned home on July 24,1982. Because of progressive headaches and dizziness, she was admitted to St. Frances Cabrini Hospital in Alexandria. A C-T Brain Scan revealed very large bifrontal cerebral contusions and a small hemorrhagic contusion in the right temporal lobe. Charlene was unsteady at the time and complained of difficulty with her immediate memory recall. She also complained of blurred vision. She was released from the hospital on August 4, 1982.
Subsequent neurological examinations revealed that Charlene suffered severe brain injury resulting in various behavioral as well as physical limitations. As a result of her injury, Charlene has memory problems, black out spells, temple lobe attacks (epilepsy), constant dull headaches, dizzy spells and difficulty in concentrating. She also completely lost her senses of smell and taste. Charlene has become very emotional and impulsive since the accident. She also has developed a compulsion for water, i.e., she drinks two to four gallons a day and takes four to five baths a day. Her sense of balance was also impaired and as a result she frequently falls down. Additionally, she is sensitive to light and has some blurring of vision.
As aforestated, the principal issues on appeal concern correctness of the jury’s determination that the right front door of *799 the suburban was not defective, and that Leroy Caubarreaux was guilty of negligent conduct which was a cause in fact of plaintiff’s injuries. These issues are interrelated and will be considered collectively.
We examine the record and the jury’s determination in light of the analysis employed in Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972), and first consider whether any causal relationship existed between the harm to plaintiff and Caubarreaux’s allegedly negligent conduct. If our analysis discloses conduct on the part of Caubarreaux which was a cause in fact of plaintiff’s injuries, then we must ascertain whether Leroy’s conduct constitutes the breach of a legal duty imposed to protect against the particular risk encountered by plaintiff.
Unfortunately, the jury’s determination of Leroy’s negligence was presented solely in the form of an affirmatively answered interrogatory, i.e., “Was Leroy Caubar-reaux negligent and was that negligence a proximate cause of plaintiff’s injuries?” We are given no guidance as to what actions by Leroy the jury considered substandard and a cause in fact of plaintiff’s injuries. In her petition, plaintiff set forth various allegations of negligence on the part of Leroy and his employer. They are as follows:
1. In operating or allowing its employee to operate a vehicle which had known defects and/or inoperative parts;
2. In failing to provide safe vehicles for its employees to operate;
3. In failing to advise guest passengers of defects in the right passenger door which had a history of “half-latching” and did not close properly; and,
4. In placing materials on the middle of the front seat between the driver and the guest passenger, causing the guest passenger to have to lean on the right door which had a history of “half-latching”.
These allegations of negligence are all based on the premise that the right front door of the suburban was defective. General Motors Corporation was made a third party defendant in this suit on the same premise, i.e., that the door through which Charlene fell was defective. However, at the conclusion of the trial, the jury returned a verdict finding that no defects existed in the door at the time of its manufacture. Based upon the evidence presented at trial, we find that the jury was eminently correct in such finding.
At the outset, we observe that there is no evidence in the record that the right front door of the suburban was changed, altered or repaired following the accident up to the date of trial.'
Subsequent to the accident, the right front door was examined on numerous occasions. It was first examined on the night of the accident by Louisiana State Police Sergeant John Medlin. Sergeant Medlin assisted Trooper Patrick Bordelon in the investigation of the accident. He took pictures of the suburban at the scene of the accident and later inspected the door at the Wildlife and Fisheries office in Opelousas. He opened and closed the door several times to see if it functioned properly. He then closed the door all the way and pulled on it with all of his strength (Medlin weighs approximately 220 pounds) to see if it would come open without activating the handle. It would not. He also closed the door part way to the “half-latch” position and pulled on it to see if it would dislodge.[3] It would not. Sergeant Medlin could find no noticeable defects in the door. He did not, however, dismantle the door.
The door was inspected on July 26, 1982 by David Normand, a mechanic at Ideal Chevrolet in Marksville. Although Nor *800 mand testified that he did not remember examining the door, he verified that the inspection slip entered into evidence was written in his handwriting. The slip stated as follows: “I have inspected above mentioned vehicle, and to the best of my knowledge, everything in right door is working fine, or good working order.” The slip was signed by David Normand. Normand testified that he inspects many doors and that he probably just checked to see if the door opened and closed properly. He stated that he probably did not disassemble the door during the inspection.
The door was again inspected in October of 1982 by Eddie E. Rayburn, an area service manager for GMC. This inspection was performed at the request of Travelers. At the time of inspection, GMC was not a party to the suit. Rayburn inspected the suburban in Opelousas at the Wildlife and Fisheries office. He checked the right front door for operating, closing, locking and latching. He found that the door opened and closed normally. He also found that when the door was in either the fully latched position or the half-latched position, it would not open without activating the handle on either the outside or inside of the vehicle. He pulled on the door from the outside and pushed on it from the inside and it would not come unlatched. Rayburn’s inspection revealed no operational problems with the door. He also did not disassemble the door. His inspection lasted between 15 and 20 minutes.
On March 30, 1984, the door was again inspected, this time by Richard Stewart. Stewart is a senior staff analysis engineer for GMC. His area of expertise is with doors, door locks, seats, window systems and restraint systems. He has worked in this particular area for over 31 years. He reviews new designs in the area of doors, locks, seats and windows, and makes necessary recommendations for improvement in such areas. He was recognized by the court as an expert in the field of automotive engineering and particularly in the field of the design and operations of doors and door locks.
Stewart first inspected the door for its fit and flushness to the body of the suburban. His testimony at trial with regards to that part of his inspection is as follows:
“... I opened the door and moved it through it’s [sic] travel, I operated it from the outside handle, I operated it from the inside handle, I opened and closed the door, I locked it with the locking button that’s on the inside and closed the door with it locked to see if I could, if it would remain in a lock [sic] condition as well as latched and locked. And if I might explain the difference when the [sic] use the terms latch and lock the door latch is the thing that holds the door closed and then when you push this little locking button down that’s the thing that locks the door so that you can’t get into it from the outside, nor can you get out of it from the inside without unlocking that. There’s also another means of locking and that is the little cylinder on the outside that you put the key in and you turn that and that also locks it. Now I checked the function of the locking mechanism of that door uh I would lock it both with a key and from the inside, close it to what I call a secondary position. You’ve heard the term half-latch here and that’s when the door goes into a first closed position, or first latch position and they’ve called it half-latch uh General Motors calls that a secondary latch and if fully closed it would be a primary latch position. So I’ll be using the terms primary latch or secondary latch and that just means fully closed and half-latch. I checked this locking operation by locking the door with both the key cylinder and the locking button, pushing it closed to a secondary latch position and pulling on the door from the outside, pushing on it from the inside, rattling it, shaking it and jarring it, joss-ling it up and down, trying to get the door to come open. I also then contined [sic] pushing it to the fully closed position, and would check that again to see if it would remain fully closed or the primary position, see if it would remain in the primary condition or position. I *801 would then do the same thing from the inside, pull them close [sic] and then try to open it up. I also in my inspection looked at the weather stripping around the door, I looked at the door, the flushness or the, the opening lines around the door to see how they worked, to check the clearances on this door. I checked the freeness and the operation of the hinges as far as the door going to a full open position and staying, in what we call a hold open and then you pull the door close [sic], it comes off the hold opening and then you can close the door in either the, the secondary or the primary latch position. I did most inspection on that door, however, I looked at all the other three passenger doors in that vehicle.”
Stewart found the door to be properly aligned. He also noted that the dent on the lower part of the right front door had no affect on the alignment of the door or the operation of the door latch. Nor did the dent in the rear bumper of the vehicle affect the door’s alignment or operation. Stewart then described how he rode around Baton Rouge in the vehicle seated in the right front passenger seat as follows:
“Well I did ride around with the, with the truck with the driver from the university and I rode in the right side position and positioned myself up against the door to where I was kinda three quarters facing ... instead of having my ... if this were straight ahead I would be out about three quarters to the center of the truck, leaned against the door with the door in the secondary latch position. I did this with the door unlocked in that position as well as the door locked in that position and I went uh I don’t have my notes with me but I, I went I believe it was a total of twelve miles, twelve, twelve and half miles with the door in the primary latch position, secondary latch position, locked and unlocked in both of those positions. I went over what I call chuck holes that are deep holes in the road that cause the truck to jaunce. Now janee [sic] means a wheel hit a hole and the whole suspension will will [sic] compress and the wheel actually bottoms out to where you bottom out the vehicle. I hit these chuck holes and bottomed out the vehicle, I went across railroad crossings, I instructed the driver uh to go down the roughest road that he could find in that area and uh we went, we made left turns, we made right turns, we backed up and made both right and left turns while we were backing up. We even went over, when we returned, I want [sic] to get some, some real good input to where the body actually twist [sic] and that is going over the curb, not at a high rate of speed, but going over the curb where one wheel at a time goes up over it and the body actually twist [sic] in there and the door is moving relative to the body. I did this in the fully latched or the primary position as well as the secondary latch position. Then we went into the parking lot and I asked instead of driving through the gate to go over those cement, I call them ties, they’re about that high, uh about ten inches high that mark off the area of the parking lot so that people won’t drive into the parking lot without going through the property and we went over these things uh purposely.”
At no time during the course of Stewart’s inspection did the door open from either the primary or secondary latch position without an affirmative act on his part to activate the door handle.
Additionally, Stewart disassembled the door and checked the door handles, latches, key cylinder and rods connected to the latch. He found that the levers were all clear. There were no burrs, wear spots or broken parts inside the door. He found no defects in the door, latches or locks as a result of his inspection. He removed the lock and placed a new one in its place. He inspected the old lock and found nothing wrong with it.
Stewart also traveled the same route which Leroy and Charlene traveled on the night of the accident. Stewart traveled 5.5 miles with the door in the secondary latch position, making a series of left and right turns. The door did not come open. He *802 also traveled 8.7 miles with the door in the primary latch position. Again, the door remained closed, despite a series of turns, stops and bumps over which the vehicle traveled. Stewart made a final trip with the door in the secondary latch position. After traveling 3.7 miles, the door remained closed. Stewart noted that when the door was in the secondary latch position, it rattled against the striker whenever the vehicle hit rough spots. He could also hear wind and road noises when the door was in this position. His speed on all of these trips ranged from a slow crawl to 45 mph. Following the testing, Stewart opined that the latch was not defective. Stewart found the latch and locks to function as they were designed and intended to function.
Alvin M. Phillips, Jr.’s deposition was read at trial. At the time of trial, Alvin, who was employed by the Museum of Geo-Science at Louisiana State University, was the main operator of the 1980 GMC suburban from which Charlene fell. His employer acquired the suburban from the State’s salvage pool in Baton Rouge.[4] Phillips testified that the right front door never opened without any explanation, nor did he receive any complaints from his co-employees who also drove the vehicle. He and his co-workers had put over 10,000 miles on the vehicle at the time of trial.
The last inspection of the right front passenger door was performed by Donny Anthony Tuminello on April 16, 1984, the day that the trial on the merits commenced. Tuminello is an Education Specialist III in the State Department of Education with prior experience in automotive mechanics. He was recognized by the court as an expert in automotive mechanics. After a 7 to 10 minute examination, Tuminello observed a dent in the rear bumper of the vehicle as well as two dents in the right front passenger door. He also noted that the right rear door protruded out at the bottom as if the impact which caused the dent in the rear bumper had caused the rear door to move forward. Tuminello surmised that the dent in the rear bumper was significant enough to knock the truck out of alignment and could have caused the front right door to open on the night of the accident. Tumi-nello stated that the dent in the lower part of the right front door was probably caused by the door being slammed with some kind of tool or object. He opined that this could also have knocked the right front door out of line. He then stated that it was a probability that the door could have opened due to the dented rear bumper and dent in the bottom of the door, assuming that the door was shut in the secondary latch position. Despite the probabilities and possibilities expressed by Tuminello, he candidly testified that he found the right front door to be properly aligned.
In light of the above, we find that the jury correctly determined that the door was not defective. The record makes clear that the primary and secondary latches operated as they were designed to operate and that the door would not open on its own when in either of these two positions. The evidence is also uncontradicted that the door was properly aligned, thereby refuting the possibility that the dents in either the bumper or the right front door could have caused the door to open on its own. This leaves only two possibilities as to what happened on the night of the accident; either Leroy failed to close the door suffi-ceintly to latch it in either the primary or secondary latch positions or the door was properly closed and Charlene inadvertently activated the door handle and opened the door.
As to the first hypothesis, Leroy testified that he closed Charlene’s door after she was seated in the truck. He stated that, as he was closing the door, he saw Charlene’s arm moving towards the door. He did not know whether or not she assisted him in closing the door, but assumed that was what she was doing with her arm. Charlene, however, denied that she assisted in closing the door. It was also brought out *803 at trial that Leroy’s right arm, the one which he closed her door with, does not have full range of motion or extension. However, Leroy testified that, because of this impairment, he turns towards the vehicle when closing the door, keeping his hand on the handle until it is closed. He stated that he closed Charlene’s door in this manner, although he does not remember if he checked the door after he closed it to see if it was properly closed. Leroy testified that he is aware of how heavy the suburban doors are and knows how much strength is needed in order to properly close them. He had been driving this particular vehicle for over one and one-half years prior to the accident, and was satisfied that he fully closed her door.
Leroy’s testimony that the right front door was securely closed prior to his departure from the parking lot is buttressed by the testimony of Richard Stewart. Stewart testified that, had the door not been closed at all, the door would have opened long before Leroy and Charlene reached the point of the accident, especially in light of the fact that Charlene was leaning against the door while traveling, and the vehicle made a series of left and right turns in Opelousas. Additionally, eyewitnesses to the accident saw the suburban in the city limits of Opelousas just prior to the accident. The suburban had passed them on the left hand side. Two of the witnesses testified that they noticed the suburban as it passed them. One witness, Deanna Stelly, testified that the passenger door did not appear to be open or only partially closed when she watched the vehicle pass them. Her husband, Howard, also testified that the right passenger door appeared to be closed. Finally, it is reasonable to conclude that had the right front passenger door been open or even half-latched, this condition would have been made obvious by wind noise or rattling. Leroy and Charlene both denied hearing any wind noise or door rattling prior to the accident, although Charlene testified that there were distracting noises inside the suburban itself, i.e., a two-way radio and a machine rattling in the rear of the vehicle.
With regard to the possibility that Charlene in some way activated the inside door handle, Charlene testified that she rode with her hands on top of her purse and books which were in her lap. She stated that she did not try to open and reclose the door that night. She also stated that she did not rest her right arm on the door’s arm rest because it was too low for her. However, the door handle is located above the arm rest. We do note here that Charlene admitted that her memory was “fuzzy” as to some of the events of that day.
Plaintiff also alludes, in brief, to the negligence of Leroy in failing to warn Charlene of the defects in the vehicle’s doors. As earlier stated, the evidence sufficiently demonstrates that the doors, and in particular the right front door, were not defective. Therefore, Leroy was under no duty to warn of a non-existent defect.
Plaintiff also asserts that Leroy was negligent, in that he had so many things on the front seat that Charlene was forced to sit near or against the right front door. Although the record reflects that the front seat was fairly crowded with an ice chest, teaching packets and pamphlets, we do not conclude that Charlene was forced to sit against the door. She could have easily moved any of the materials out of her way, or at least requested Leroy to do so. She also could have locked her door to insure her own safety. Leroy testified that he did not notice that Charlene was cramped for space. He stated that he would have moved some of the items off of the seat had he thought they were in her way or had she complained. We cannot conclude from the record that Leroy’s conduct in this regard was sub-standard or a cause in fact of plaintiff’s injury.
Our jurisprudence provides us with several cases in which automobile passengers were injured when a car door unexpectedly opened causing them to fall from the vehicle. One case which is factually similar to the instant case is Morales v. Employers’ Liability Assurance Corp., 202 La. *804 755,12 So.2d 804 (1943). In Morales, plaintiff was riding in an ambulance which was transporting her sick daughter to the hospital. The ambulance driver had closed the door behind plaintiff and two other passengers after they entered and seated themselves in the rear portion of the ambulance. Plaintiff was seated next to the right door out of which she eventually fell. The trial court dismissed plaintiffs suit and the First Circuit Court of Appeal affirmed, finding that the ambulance driver had used ordinary and reasonable diligence in getting the passengers into the ambulance and in seeing that the doors were closed. The First Circuit stated in Morales v. Employers’ Liability Corp., 7 So.2d 660 (La.App. 1st Cir.1942):
“... the driver is not bound to exercise the highest practicable degree of care as is a common carrier, nor is he to be held liable as an insurer, but is only held to the exercise of the ordinary care of a reasonably prudent man in the management and operation of the automobile
In affirming the two prior court’s decisions, the Supreme Court found plaintiffs allegation that the doors of the ambulance were not securely closed and fastened to be unsupported by the evidence. The record indicated that the ambulance driver securely closed all of the doors on the ambulance prior to their departure. The vehicle then traveled several miles and made a number of turns before the occurrence of the accident. Thus, the court noted that had the door not been properly closed, it would have opened prior to the time of the accident. Additionally, the passengers would have been alerted to such condition by the rattling of the door. No such noise was heard by any of the passengers. Also, no defects were found in the door or its latching mechanism
In rejecting the applicability of the doctrine of res ipsa loquitur in Morales, the Supreme Court held:
“It is fundamental that negligence is never presumed from the happening of an accident, but the happening of an accident with its attendant circumstances may justify the inference of negligence. Jones v. Shell Petroleum Corporation, 185 La. 1067, 171 So. 447 [ (1936) ].
To render the doctrine applicable in an automobile accident, the accident must be one which ordinarily could not happen except through defects in the car or fault in its operation, or both. But the doctrine applies only where the circumstances leave no room for a different presumption, and it must appear that the probable cause was within the control of the operator of the automobile against whom the doctrine is sought to be invoked. 5 Am.Jur., Automobiles, § 607, p. 839.

Moreover, the portion of the ambulance occupied by plaintiff and her two near relatives was in their exclusive control and not in the control of the driver of the ambulance. They were in a better position than the driver to adjust themselves to the seats provided and the conditions under which they chose to ride. The driver, while in the cab, was not in a position to discharge his duties and at the same time to take care of the occupants of the rear portion of the ambulance, who were fully able to take care of themselves. ...”
In discussing the possibility that plaintiff inadvertently activated the door handle, the court stated:
“It is not an unusual occurrence for an occupant of an automobile to inadvertently lean against the door, or to depress its handle in such a way as to cause the door to fly open, and in many cases causing the occupant to fall out of the car.”
In Minton v. Continental Insurance Company, 110 So.2d 789 (La.App. 1st Cir.1959), plaintiff-wife was injured when the right front door unexpectedly opened, causing her to fall out of the vehicle being driven by her husband. Her husband, seated in the driver’s seat, had opened her door from the inside of the car. After plaintiff only partly closed her door, her husband leaned over and completely closed and *805 locked the door. The door later opened as the husband was making a left turn, resulting in plaintiffs fall from the car. Plaintiff brought suit against her husband’s liability insurer on the basis of res ipsa loqui-tur and, in the alternative, for the negligence of her husband in driving carelessly and imprudently. The trial court rejected plaintiffs demands and the Court of Appeal affirmed. After finding the doctrine of res ipsa inapplicable, the Court of Appeal held that plaintiff had failed to establish her husband’s negligence by a fair preponderance of the evidence. The evidence also revealed that the door of the automobile was neither defective or improperly maintained. The court stated that “[i]t is elementary that the mere occurrence of an accident does not give rise to a presumption of negligence.”
Ardoin v. Millers Mutual Fire Insurance Company of Texas, 92 So.2d 123 (La.App. 1st Cir.1957), also dealt with a passenger sustaining injuries due to a fall from a vehicle. In Ardoin, the decedent was seated next to the right rear door of a vehicle being driven by his daughter. The door suddenly opened and decedent fell out and was fatally injured. Decedent’s surviving widow brought suit against the liability insurer of the owner of the car. The trial court dismissed plaintiff’s demands. Citing Morales, the Court of Appeal denied recovery on the basis of res ipsa. The court then went on to determine whether plaintiff had borne the burden of proof necessary to establish negligence on the part of decedent’s daughter or her husband, the car’s owner. The court found that she had not. The court held that the daughter was driving in a careful and prudent manner. Additionally, the court stated that “[ajfter reading the entire testimony we believe that this door came open as the result of some act on the part of the deceased. Even if we were in error in such a belief, the plaintiff has failed to prove any negligence on the part of the driver or owner of the automobile.” (Unlike the present case, there was direct testimony to the effect that the decedent was trying to open and re-close the door at the time of the accident.)
Still another case involving injury due to the unexplained and unexpected opening of a car door is that of Hill v. Insurance Company of North America, 279 So.2d 715 (La.App. 1st Cir. 1967), writ denied, 282 So.2d 139 (La.1978). In Hill, plaintiff fell out of the right front door of a vehicle driven by her husband. Plaintiff had closed her own door. The door suddenly opened as the husband was backing the vehicle up, causing plaintiff to fall from the vehicle. Plaintiff brought suit against her husband’s insurer. The case was tried before a jury which rendered a verdict in plaintiff’s favor. On appeal, the First Circuit reversed, finding plaintiff had failed to sustain the burden of proving that her injuries were caused by the negligent operation of the vehicle by her husband. The evidence also showed that there was no mechanical defect in the locking mechanism of the door which opened. The court surmised from the evidence that the door was either not properly closed or the plaintiff unintentionally operated the unlocking mechanism by movement of the door handle.
The evidence in this case clearly demonstrates that the right front door of the suburban was not defective but in perfect working order. Caubarreaux testified that he securely closed the right front door of the suburban after plaintiff’s entry. His testimony in this regard was not refuted or contradicted but rather is corroborated by the circumstances previously alluded to and the testimony of witnesses who viewed the suburban in transit. It is not contended nor does the record reflect that Caubar-reaux was driving at an excessive speed or in a careless or reckless manner. In sum, our careful examination of the record mandates the conclusion that plaintiff failed to establish by a reasonable preponderance of the evidence that any conduct on the part of Caubarreaux was a cause in fact of the injuries she sustained in this unfortunate accident, and the trial jury clearly erred in finding to the contrary. Although we entertain the utmost compassion for plaintiff, *806 our conclusion commands that the trial court judgment be reversed and plaintiff’s demands be dismissed.
For the above and foregoing reasons, the judgment of the trial court insofar as it ordered a dismissal of the third party demand filed by Leroy G. Caubarreaux, the State of Louisiana, through the Department of Wildlife and Fisheries, and The Travelers Insurance Company against General Motors Corporation is affirmed. In all other respects, the judgment of the trial court is reversed, and it is now ordered that plaintiffs suit against Leroy G. Cau-barreaux, the State of Louisiana, through the Department of Wildlife and Fisheries, and The Travelers Insurance Company, be and the same is hereby dismissed with prejudice. All costs at the trial level and on appeal are assessed to plaintiff, Charlene Beauclair.
AFFIRMED IN PART; REVERSED IN PART; AND, RENDERED.

. The State filed a third party demand against Caubarreaux and Travelers for contribution for any sums it would have to pay if found liable to plaintiff for worker’s compensation benefits. Following finality of the summary judgment dismissing plaintiffs demand for worker’s compensation benefits, the State’s third party demand was dismissed upon joint motion by the State, Caubarreaux and Travelers.

. The jury’s break down of damages is as follows:
a. Past pain and suffering $ 25,000
b. Future pain and suffering $ 25,000
c. Loss of past earnings $ 21,000
d. Loss of future earnings $ 279,000
e. Past medical expenses $ 10,000
f. Future medical expenses S 200,000
g. Permanent disability or disfigurement $ 700,000
TOTAL $1,260,000
*798 By amended judgment dated June 25, 1984, Travelers’ liability was limited to its policy limits of 1300,000.00.

. Although referred to by plaintiffs attorney throughout trial as the "half-latch” problem, the half-latch on the door is actually a safety feature specifically designed for this type of vehicle door. Also called the secondary latch, the half-latch has all of the same functions and works the same way as the fully closed (primary latch) position. Because the doors on suburbans are so heavy, the half-latch maintains the door lock in cases where the door is not properly closed all the way. As with the primary latch, the door remains closed when half-latched until either the inside or outside door handle is activated.

. Leroy testified that when the suburban reached 83,000 miles, it was turned over to the salvage pool. Such was the policy on all state vehicles which he used.